**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

HAROLD LITWIN, On Behalf of Himself
and All Others Similarly Situated,

   Plaintiff,

   v.

MONSTER WORLDWIDE INC., TIMOTHY
T. YATES, EDMUND P. GIAMBASTIANI,
JR., JOHN GAULDING, JAMES P.
MCVEIGH, GILLIAN MUNSON, JEFFREY
F. RAYPORT, and ROBERTO TUNIOLI,

   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:16-cv-11844

**CLASS ACTION
COMPLAINT FOR
VIOLATION OF THE
FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Plaintiff Harold Litwin ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.  This is a class action brought on behalf of the public stockholders of Monster Worldwide, Inc. ("Monster" or the "Company") against Monster and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(d)(4), 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9") and to enjoin the expiration of a tender offer on a proposed transaction, pursuant to which Monster will be acquired by Randstad Holding NV ("Randstad"), through its U.S.-based subsidiary Randstad North America, Inc. ("Parent") and Parent's wholly-owned

subsidiary Merlin Global Acquisition, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On August 9, 2016, Monster and Randstad issued a joint press release announcing that they had entered into an Agreement and Plan of Merger dated August 8, 2016 (the "Merger Agreement") to sell Monster to Randstad.  Subject to the terms of the Merger Agreement, Merger Sub commenced a tender offer (the "Offer") to purchase all of the outstanding shares of Monster common stock for $3.40 in cash for each share of Monster they own (the "Offer Price").  Following consummation of the Offer, Merger Sub will merge with and into Monster with the Company surviving as a wholly-owned subsidiary of Parent.  The Proposed Transaction is valued at approximately $429 million.  The Offer commenced on September 6, 2016 and will expire on October 3, 2016, and thus, time is of the essence.

3.      The Proposed Transaction is the result of an unfair process and provides the Company's stockholders with inadequate consideration.  As further described below, both the value to Monster stockholders contemplated in the Proposed Transaction and the process by which defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other public stockholders of the Company.

4.      Furthermore, the Board agreed to lock up the Proposed Transaction with a number of coercive deal protection devices in the Merger Agreement, including: (i) a "no-solicitation" clause that prevents the Company from soliciting, and subject to minimal exceptions, from providing non-public information to potential alternate bidders; (ii) an "information rights" provision that requires the Company to promptly advise Randstad of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal; (iii) "matching rights" that allow Randstad four (4) days to match any superior offer, plus an additional two (2) day period following a material amendment

to the terms and conditions of a superior offer or the submission of a new offer; and (iv) a provision requiring Monster to pay a termination fee of $9 million if the Company decides to pursue a competing offer.  The collective effect of these provisions is to chill any potential post-deal market check.

5.      Finally, compounding the unfairness of the Proposed Transaction, on September 6, 2016, Monster filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC.  The Recommendation Statement, which recommends that Monster stockholders tender their shares in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Monster's financial projections, relied upon by Monster's financial advisor, Evercore Group L.L.C. ("Evercore"); (ii) the data and inputs underlying the financial valuation analyses that purportedly support the so-called "fairness opinion" provided by Evercore; and (iii) the background process leading to the Proposed Transaction.  The failure to adequately disclose such material information constitutes a of Sections 14(d), 14(e) and 20(a) of the Exchange Act as stockholders need such information in order to make a fully informed decision whether to tender their shares in support of the Proposed Transaction.

6.      As further discussed below, defendants' failure to disclose material information is critical in light of the inadequate Offer Price.  The inadequacy of the Offer Price is further evidenced by the fact that: (i) as recently as July 8, 2016, an analyst at BMO Capital Markets set a $4.00 per share price target for the Company, which is $$0.60 above the $3.40 Offer Price; (ii) the Offer Price is a significant discount to Monster stock's 52-week trading high of $7.65 per share; and (iii) the Company's stock traded above the Offer Price as recently as April 27, 2016, when it reached $3.41 per share.

7.     In short, the Proposed Transaction is designed to unlawfully divest Monster's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.   To remedy defendants' Exchange Act violations, Plaintiff seeks to enjoin the expiration of the tender offer unless and until such problems are remedied.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1331 (federal question jurisdiction), as this Complaint alleges violations of Sections 14(d)(4), 14(e) and 20(a) of the Exchange Act and SEC Rule 14d-9.

9.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.   Monster is headquartered in this District.   Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

11.     Plaintiff Harold Litwin is, and has been at all times relevant hereto, a continuous stockholder of Monster.

12.     Monster, a Delaware corporation, is a global online employment solutions company that provides job seeking, career management, recruitment and talent management services.   The

Company's corporate headquarters are located at 133 Boston Post Road, Building 15, Weston, Massachusetts 02493.  Its common stock trades on the New York Stock Exchange under the ticker symbol "MWW."

13.     Defendant Timothy T. Yates ("Yates") has been Monster's Chief Executive Officer ("CEO") since November 2014, Chief Financial Officer ("CFO") since February 2016, and a director since June 2007.  Defendant Yates had a prior stint as Monster's CFO from June 2007 to January 2011, served as President from November 2014 to October 2015, and Executive Vice President from June 2007 to June 2013.

14.     Defendant Edmund P. Giambastiani, Jr. ("Giambastiani") has been Chairman of the Board since March 2015 and a director of the Company since January 2008.   Defendant Giambastiani is a member of the Audit Committee and the Corporate Governance and Nominating Committee.

15.     Defendant John Gaulding ("Gaulding") has been a director of the Company since June 2001.  Defendant Gaulding is Chair of the Compensation Committee, a member of the Audit Committee, and a member of the Corporate Governance and Nominating Committee.  Defendant Gaulding was previously a director of the Company from 1996 to 1999.

16.     Defendant James P. McVeigh ("McVeigh") has been a director of the Company since April 2015.  Defendant McVeigh is a member of the Audit Committee and the Compensation Committee.

17.     Defendant Gillian Munson ("Munson") has been a director of the Company since December 2015.

18.     Defendant Jeffrey F. Rayport ("Rayport") has been a director of the Company since April 2010.  Defendant Rayport is Chair of the Corporate Governance and Nominating Committee,

and is a member of the Audit Committee.

19.     Defendant Roberto Tunioli ("Tunioli") has been a director of the Company since September 2008.  Defendant Tunioli is Chair of the Audit Committee, and is a member of the Compensation Committee.

## OTHER RELEVANT PARTIES

20.     Randstad is a Dutch multinational human resource consulting firm.  Randstad's corporate headquarters are located at Diemermere 25, 1112 TC Diemen, the Netherlands. Randstad trades on the Euronext exchange under the ticker symbol "RAND."

21.     Parent, Randstad's U.S.-based subsidiary, is a Delaware corporation and maintains its principal executive offices at One Overton Park, 3625 Cumberland Boulevard, Suite 600, Atlanta, Georgia 30339.

22.     Merger Sub is a Delaware corporation and a direct wholly-owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Monster common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

25.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained

through discovery, Plaintiff believes that there are thousands of members in the Class.  As of September 1, 2016, there were approximately 89,071,629 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Monster or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

26.     Questions of law and fact are common to the Class, including, among others, whether the Recommendation Statement is materially false and misleading.

27.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of defendants' wrongful conduct as alleged.

28.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

30.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Outlook

31.     Monster owns and operates Monster.com, one of the most visited employment websites in the United States and one of the largest in the world.  Monster provides job seeking, career management, recruitment and talent management services.

32.     Monster pioneered the business of digital recruiting in 1994, and today is the only online recruitment provider able to serve its customers on a truly global basis.  In addition to its broad portfolio of global websites, Monster offers valuable online advertising space on a network of websites that connect companies to highly targeted audiences at critical stages in their lives—such as Military.com and FastWeb.com.

33.     In May 2014, Monster revealed a new strategy to drive its business forward and enhance its competitive position in the small business market.  The Company's "All the Jobs, All the People" approach focuses on three portfolios: Monster Reach, Monster Connections and Monster Solutions.  Monster Reach comprises a portfolio of recruitment advertising products that provide turnkey solutions for employer customers to reach and convert candidates in active, passive and social environments.  Monster Connections is a suite of search and communications products enabling employer customers to discover and connect with talent on the Monster network of websites and anywhere on the social web.  Monster Solutions is a portfolio of cloud based solutions and services that bring the power of Monster's technology and capabilities to a wide range of commercial, staffing and government customers.

34.     While the Company had experienced less than desirable financial results, in recent quarters the Company has enMonstered improved financial success from its new approach.  On October 29, 2015, Monster announced its financial results for the third quarter of 2015.  The Company reported adjusted EBITDA of $32.4 million, an increase of 40% year over year.  Adjusted EBITDA from continuing operations was $28.1 million, an increase of 45% year over year.  Monster reported that it exceeded expectations on all profitability metrics for the fifth consecutive quarter.  The Company also reported improved financial flexibility following the sale of its remaining South Korean affiliate ownership stake for approximately $85 million.

Commenting on the quarter's financial results, defendant Yates stated:

> We are gratified that we achieved our 18-22% EBITDA margin goal a full quarter earlier than expected and adjusted EPS were at the high end of our guidance range. Our new product strategy continued to gain traction with wider customer acceptance on a global basis. Revenue was essentially flat as stronger than anticipated results from Europe were offset by weaker than expected results in North America. We are extremely confident of Monster's ability to drive increased revenue and improving EBITDA margins going forward. As a sign of this confidence and our improved liquidity position as a result of the monetization of JobKorea, we are pleased to announce that our Board has authorized a $75 million buyback which we anticipate implementing as we generate free cash flow in the quarters ahead, beginning in the fourth quarter of 2015.

35.     On February 11, 2016, Monster announced its financial results for the fourth quarter and full year of 2015.  For the quarter, the Company reported adjusted EBITDA from continuing operations of $28.9 million, an increase of 36% year over year.  Adjusted EBITDA margin from continuing operations expanded to 18.1% from 12.2% year over year and 16.8% quarter over quarter.  Non-GAAP EPS was $0.12, more than double year over year.  The Company reported cash flow from operations of $18.7 million, with strong improvement in liquidity.  Monster exceeded expectations of all profitability metrics for the sixth consecutive quarter.  For full year 2015, Monster reported total revenue from continuing operations of $666.9 million, compared to $725.6 million year over year.  Commenting on the highly improved fourth quarter financial results, defendant Yates stated:

> We are pleased to report solid improvement in earnings and cash generation consistent with our plan despite less than expected revenue for the fourth quarter. ***While we have much more work to do to fully implement our All the Jobs, All the People strategy, we made real progress during 2015***.  Business trends improved on a year over year basis while new products continue to be an increasing percentage of our overall business.  The progress we showed in growing the revenue and profit in our European business continued this quarter and a number of our channels in North America showed strong performance.  We underperformed in North America in our transactional business as a result of competitive pressures and seasonality, as well as macro considerations in Canada.  ***We have implemented a number of actions which we believe will improve our performance going forward***, remain fully committed to revenue and cash flow growth in 2016, and

expect to generate Cash EBITDA in the range of $85 million to $100 million. During the quarter, we repurchased 1.3 million shares as part of the stock buyback plan and our board has given us the flexibility to be more aggressive in implementing this program to take advantage of the current market opportunity.

Emphasis added.

36.     On May 5, 2016, the Company issued a press release announcing its financial results for the first quarter of 2016.  Monster reported cash EBITDA of $19.5 million, a significant increase compared to cash EBITDA of $8.1 million year over year.  The company reported that non-GAAP EPS met expectations and new products continued to grow, contributing 8% to revenue.  Commenting on the financial results, defendant Yates stated:

> We continue to make steady progress on implementing our All the Jobs, All the People strategy which is improving our value proposition for our customers and job seekers.  While results in our North America business in the first quarter were mixed, we have experienced improving trends in our European business for the third consecutive quarter.  Additionally, we repurchased both equity and a portion of the convertible notes outstanding, demonstrating our confidence in our business and starting in the second quarter, as previously noted, we will be increasing investments in a couple of targeted product and marketing areas designed to accelerate top line growth. Overall, we are pleased with our earnings performance and cash generation during the quarter, and we remain focused on revenue growth.

**The Flawed Sale Process**

37.     Sometime after the "All the Jobs, All the People" strategy was launched a consensus was reached by the Board to allow Yates and Company management to field indications of interest without having to engage in a sale process.

38.     Thereafter, in early December 2015, Yates contacted a potential strategic acquirer referred to in the Recommendation Statement as "Strategic Acquirer A" to discuss a potential strategic combination.

39.     Later in December 2015, defendant Yates, Monster President and Chief Operating Officer ("COO") Mark Stoever ("Stoever") and representatives of Strategic Acquirer A met to discuss a high-level business plan for a possible strategic combination.

40.     Shortly thereafter, in January 2016, Strategic Acquirer A withdrew its interest in a business combination with Monster.

41.     On March 24, 2016, Monster received a non-binding indication of interest to acquire the Company for $4.30 per share from a private equity firm referred to in the Recommendation Statement as "Financial Acquirer B".  Financial Acquirer B had participated in the Company's sale process that terminated in 2013.  Board members directed management to further engage with Financial Acquirer B.

42.     On March 26, 2016, a Company representative conducted a telephonic conference with the Chief Innovation Officer ("CIO") at Randstad to discuss a variety of topics.

43.     On April 1, 2016, Yates, Monster's President and COO Stoever , and representatives from Evercore met with Financial Acquirer B to discuss its proposal.  Yates indicated that Financial Acquirer B would need to propose a price higher than $4.30 per share in order to proceed further.

44.     Following the April 1, 2015 meeting, Financial Acquirer B indicated to Evercore that it would be prepared to increase its proposal to $4.45 per share or more.

45.     On April 4, 2016, Financial Acquirer B and Monster executed a confidentiality agreement, which included a standstill provision, the full terms of which are not disclosed in the Recommendation Statement, including, critically whether the standstill contains a fall away provision whereby the standstill fell away upon Monster's entry in to the Merger Agreement with Randstad.

46.     On April 5, 2016, Yates and Stoever met with a private equity firm referred to in the Recommendation Statement as "Financial Acquirer C" that had expressed interest in acquiring the Company.

47.     On April 7, 2016, Financial Acquirer C entered into a confidentiality agreement with the Company, which included a standstill provision the specific terms of which are not disclosed in the Recommendation Statement.

48.     On April 13, 2016, after discussing with the Board, Yates met with a representative of a potential strategic acquirer referred to in the Recommendation Statement as "Strategic Acquirer D" that had participated in Monster's sale process that terminated in 2013.  At the meeting, Strategic Acquirer D expressed interest in a future acquisition of the Company with an interim plan to make a significant minority investment in Monster.

49.     On April 22, 2016, Financial Acquirer C notified defendant Yates that it was not prepared to move forward at that time.

50.     On April 23, 2016, Strategic Acquirer D informed defendant Yates that it had determined not to pursue a partnership, investment or strategic transaction with Monster at that time.

51.     On April 24, 2016, Financial Acquirer B informed Evercore that it would be unable to increase its potential offer price above $4.45 without additional information from the Company. The Company paused conversations with Financial Acquirer B, in part because the Company had not yet decided to initiate a formal due diligence process with Financial Acquirer B.

52.     On April 25, 2016, the Board formally engaged Evercore as its financial advisor.

53.     On May 12 and 13, 2016, Yates, Stoever, and Randstad North America CEO Linda Galipeau ("Galipeau") met to discuss topics from the March 26, 2016 meeting with Randstad's CIO.

54.     On June 9, 2016, Stoever and other Company representatives met with Randstad's CEO Jacque van den Broek ("van den Broek"), Galipeau and members of the Randstad Innovation Fund to discuss Monster's technology, products and strategy.

55.     On June 15, 2016, Galipeau called defendant Yates to reiterate Randstad's interest in pursuing a transaction with the Company and that Randstad would seek to work towards an agreeable price once it conducted preliminary due diligence.

56.     On June 20, 2016, Randstad and Monster executed a confidentiality agreement, which included a standstill provision.

57.     On July 5, 2016, Randstad's financial advisor, Wells Fargo Securities LLC ("Wells Fargo"), sent Evercore, Randstad's non-binding preliminary indication of interest to acquire the Company for $3.50 per share in cash.

58.     Also on July 5, 2016, Yates met with a potential commercial partner at its request, referred to in the Recommendation Statement as "Strategic Acquirer E."  While no price was discussed, Strategic Acquirer E indicated it would like Yates to meet its Chairman who had indicated a desire to acquire the Company.

59.     On July 6, 2016, Evercore contacted Wells Fargo to relay the Company's disappointment with Randstad's preliminary indication of interest.

60.     On July 7, 2016, Strategic Acquirer E and Monster executed a confidentiality agreement, which included a standstill provision, the full terms of which are not fully disclosed in the Recommendation Statement.

61.     On July 8, 2016, Yates and Stoever met with Strategic Acquirer E and informed Strategic Acquirer E that because of its complex internal situation, it would have to propose a price of at least $5.00 per share with no financing condition.

62.     On July 10, 2016, Galipeau called Yates to further discuss a potential transaction between Randstad and the Company, including matters related to valuation, employee change in control provisions and net debt levels.   Yates indicated to Galipeau that there had been other inbound inquiries at higher prices, and Galipeau noted that Randstad would require additional financial and business information to proceed with a higher price.

63.     On July 12, 2016, Strategic Acquirer E contacted Yates and outlined a proposal to acquire Monster for $5.00 cash per share, subject to completion of due diligence.

64.     Also on July 12, 2016, Financial Acquirer B contacted Evercore to express its continued interest in the Company and its intent to send the Company a letter reaffirming its prior proposal.

65.     On July 13, 2016, Monster received a letter from Financial Acquirer B reaffirming its interest.  Shortly thereafter, Monster provided Financial Acquirer B with its preliminary second quarter results for 2016.

66.     On July 14, 2016, on behalf of Randstad, Wells Fargo sent to Evercore a revised non-binding indication of interest to acquire the company for $3.70 per share in cash.

67.     Following receipt of Randstad's July 14, 2016 indication of interest, Yates informed Galipeau that the $3.70 share price was insufficient to grant exclusivity, that a new potential strategic acquirer was moving on an expedited time frame, and that the Company wished to have a definitive agreement no later than the announcement of second quarter earnings.

68.     On July 18, 2016, Yates and Stoever met with Strategic Acquirer E and its bankers at Evercore's New York offices to present Monster's business plan.

69.     On July 20, 2016, Galipeau called Yates to inform him that Randstad would increase its interest to $4.00 per share all cash, subject to due diligence, and would work toward an August 9, 2016 announcement so long as Monster granted Randstad exclusivity.

70.     Later on July 20, 2016, Wells Fargo delivered to Evercore Randstad's further revised non-binding indication of interest to acquire Monster for $4.00 per share and provided a copy of an exclusivity agreement.

71.     On July 21, 2016, Financial Acquirer B requested a meeting with Monster's management to discuss its forecasts in light of Monster's second quarter results, but Monster gave Financial Acquirer B the cold shoulder and did not respond to this inquiry despite Financial Acquirer B having previously reaffirmed its interest to acquire the Company for $4.30 per share.

72.     Inexplicably, that same day, the Board held a special meeting with senior management representatives, Evercore and the Company's outside legal counsel, Dechert LLP ("Dechert"), to consider Randstad's July 20, 2016 proposal.  Following discussion of Randstad's proposal, the Board decided to wall itself off from further negotiations with Financial Acquirer B and concluded that Monster should enter into an exclusivity agreement with Randstad and authorize management to negotiate definitive documentation to effect the terms of the proposal.  Following this meeting, Yates informed Galipeau of the Board's direction.

73.     On July 22, 2016, Randstad and Monster executed the Exclusivity Agreement, which granted Randstad exclusivity through August 8, 2016.  However, if prior to such date Randstad reduced its valuation of Monster to below $4.00 per Share, Monster had the right to terminate the Exclusivity Agreement.

74.     Shortly thereafter, on July 26, 2016, Financial Acquirer B sought a meeting with Monster to discuss Monster's financial forecasts.  Monster, having handcuffed itself by entering into the Exclusivity Agreement with Randstad, responded that it could not do so at that time.

75.     On August 4, 2016, Galipeau called Yates to inform him that Randstad was no longer willing to proceed at the $4.00 per share offer price, and that it was instead only willing to proceed at $3.40 per share.  Instead of breaking exclusivity because of Randstad's price reduction and reengaging with Financial Acquirer B and other potential counterparties, after conferring with the Board, Yates told Galipeau that the Company would proceed with $3.40 per share on the conditions that the parties continue on the timeframe to announce a transaction on August 9, 2016, confirmation that Randstad's due diligence was substantially complete, and the material terms of the Merger Agreement were in place.

76.     On August 7, 2016, the Board held a special meeting with Evercore and Dechert reviewing the $3.40 consideration.  Evercore rendered its opinion to the Board that the price was fair from a financial point of view to stockholders.  Following further discussion of the Merger Agreement, the Board unanimously determined it was fair, advisable, and in the best interests of Monster and its stockholders.

77.     During the evening of August 8, 2016, the parties entered into the Merger Agreement.  The next morning, the parties issued a joint press release before the opening of the New York Stock Exchange.

78.     On August 18, 2016, Evercore, Dechert and Monster received an unsolicited indication of interest from a party referred to in the Recommendation Statement as "Financial Acquirer F" with an offer price of $3.60 per share in cash.

79.     On August 19, 2016, MediaNews Group, Inc. ("MediaNews") issued a press release and letter to the Board disclosing that it had accumulated an 11.6% ownership stake in Monster, and voicing strong opposition to the Proposed Transaction.

80.     Later that day, the Board held a special meeting to discuss Financial Acquirer F's indication of interest.   Representatives of Evercore and Dechert subsequently spoke to representatives of Financial Acquirer F.

81.     On August 21, 2016, the Board held a special meeting during which it determined that Financial Acquirer F's proposal constitutes, or would reasonably be expected to lead to, or result in, a superior proposal—and that failure to engage in negotiations or discussions with Financial Acquirer F would be inconsistent with its fiduciary duties.   The Board then authorized management, Dechert and Evercore to negotiate a confidentiality agreement, begin due diligence and engage in negotiations.   Randstad was notified of the Board's determination.

82.     On August 23, 2016, Financial Acquirer F and Monster executed a confidentiality agreement, which included a standstill provision.   Monster subsequently provided Financial Acquirer F access to its electronic data room and Financial Acquirer F began its due diligence.

83.     On August 24, 2016, Monster issued an open letter to stockholders in rebuttal of MediaNews' August 19 press release and letter to the Board.

84.     On August 29, 2016, Financial Acquirer F sent a letter informing representatives of Evercore that, given the results of its due diligence, it was terminating its discussions with Monster.

**The Proposed Transaction is Inadequate**

85.     On August 8, 2016, following the Board's approval, Monster entered into the Merger Agreement with Randstad and its subsidiary for inadequate consideration.   On August 9, 2016, Monster and Randstad issued a joint press release stating, in relevant part:

AMSTERDAM and WESTON, Mass., Aug. 9, 2016 -- Randstad Holding nv (AMS: RAND), a leading human resources services provider, and Monster Worldwide, Inc. (NYSE: MWW), a global leader in connecting jobs and people, today announced the signing of a definitive agreement under which Randstad will acquire Monster. Under the terms of the merger agreement, Randstad will pay $3.40 per share in cash, or a total purchase price of approximately $429 million (enterprise value).

By leveraging Monster's multiple distribution channels to bridge two different but complementary parts of the extended recruiting industry, Randstad intends to build the world's most comprehensive portfolio of HR services. Monster will continue operating as a separate and independent entity under the Monster name.

* * *

Under the terms of the merger agreement, Randstad has agreed to commence a tender offer, through a wholly-owned subsidiary, to acquire all of the outstanding shares of Monster common stock for $3.40 per share in cash. The Boards of Directors of both Randstad and Monster have unanimously approved the terms of the merger agreement, and the Board of Directors of Monster has resolved to recommend that shareholders accept the offer, once it is commenced. The consideration represents a 22.7% premium to Monster's closing stock price on August 8, 2016, the last trading day prior to today's announcement and a 30.1% premium to the 90 day volume weighted average stock price. The purchase price implies an enterprise value to LTM 6/30/2016 Adjusted EBITA multiple of 8.9x (excluding stock based compensation) and 10.3x (including stock based compensation). The acquisition is structured as an all-cash tender offer for all outstanding issued common stock of Monster followed by a merger in which remaining shares of Monster would be converted into the same U.S. dollar per share consideration as in the tender offer. The transaction does not have a financing condition and is expected to be completed in the fourth quarter of 2016, subject to regulatory approvals.

86.     Given the potential for increased growth and strong earnings, the Proposed Transaction fails to adequately compensate Monster's stockholders for the intrinsic value of the Company, as well as the significant benefits Randstad will receive from the Proposed Transaction. Randstad is seeking to acquire the Company at a time when the long-term prospects of Monster are increasing, and while its stock price is undervalued.  For example, as recently as July 8, 2016, analyst Jeffrey M. Silber at BMO Capital Markets set a $4.00 target price for Monster, which is $0.60 above the $3.40 Offer Price.  Moreover, the Offer Price is a significant discount

to Monster stock's 52-week trading high of $7.65 per share.  Additionally, the Company's stock traded above the Offer Price as recently as April 27, 2016, when it reached $3.41 per share.

87.     On August 19, 2016, MediaNews issued a press release and sent a letter to the Board disclosing that it had acquired an 11.6% ownership stake in the Company, was now Monster's largest stockholder, and opposes the Proposed Transaction because it believes the $3.40 per share deal would represent the textbook definition of "selling at the bottom."  MediaNews urged Company stockholders not to tender their shares and recommended that Monster explore all strategic options.  Based on extensive research and hands-on management experience, MediaNews proposed five recommendations to the Board:

- Reduce expenses by $100-$150 million through implementation of operational best practices

- Monetize non-core/underperforming assets that are not being valued at all in current stock price

- Reduce capital expenditures to be more in-line with competitors and other digital companies

- Simplify the product offering and increase sales productivity

- Focus marketing efforts on B2B customer acquisition and candidate acquisition, with a focus on ROI, and execute a re-branding campaign to attract millennials

88.     In the letter MediaNews sent to the Board, MediaNews Senior Vice President Joe Anto ("Anto") stated:

> It is our understanding that the Randstad deal was ***not the result of a formal auction process***. It seemed to ***come together very quickly*** (Randstad executed a confidentiality agreement on June 20th, and a deal was announced just 50 days later on August 9th), apparently ***without any attempt to fully market the Company*** in recent months. We think a more thoughtful strategic alternatives review, which includes a detailed review of business operations and restructuring options, in conjunction with a robust auction process, would be a more prudent course of action

vs. selling to Randstad at $3.40 per share. Given the no-shop provision the Company has agreed to in its merger agreement with Randstad, we welcome the opportunity to speak with other potential buyers to discuss their interest in the business.

\* \* \*

With regard to Randstad's offer, the $3.40 price implies a 4.9x multiple of LTM adjusted EBITDA of $87.6M[ii] and a 0.7x multiple of LTM revenue of $635M, which in and of themselves are **low relative to where the 2016 Proxy Peer Group[iii] trades** (Mean LTM EBITDA multiple of 12.2x and revenue multiple of 3.4x), **where other digital assets have been sold** (Mean LTM EBITDA multiple of 14.2x[iv] and revenue multiple of 4.6x), **and where Monster has traded the past three year**s (Mean LTM EBITDA multiple of 7.0x[v]).

\* \* \*

By implementing the recommendations we have outlined here and having the proper oversight to ensure successful execution, **we are confident that Monster can achieve a stock price of $6-$8 over the next 18 months, representing an upside of 76%-135% over Randstad's price**. This plan, in part, is predicated on being able to significantly reduce the rate of revenue decline at Monster. However, if the Company is able to return to revenue growth, which we believe is achievable, there is potentially significant upside to these price targets.

Emphasis added.

89.     Importantly, the Proposed Transaction fails to adequately compensate Monster's stockholders for the significant benefits that Randstad will receive from the merger.  The August 9, 2016 joint press release outlined the benefits to Randstad:

Brings Together Complementary Visions to Lead Transformation: Randstad and Monster have a shared vision for the global job industry, which is rapidly transforming as a result of technology advances. The transaction is intended to accelerate their ability to develop new and innovative capabilities that deliver greater value to job seekers and employers by bringing labor supply and demand closer                                                                                together.

Creates Most Comprehensive and Technologically Advanced Capabilities for Human Resources Services: Randstad continues to enhance its business model in the rapidly shifting landscape, placing annually more than 2 million people worldwide through its network of more than 4,500 branches and client-dedicated services. With the addition of Monster's leading recruiting media, technologies, and platforms which connect people and jobs in more than 40 countries, Randstad intends to further expand its services to offer both clients and candidates tools for

increased efficiency and engagement, connecting more people to more jobs.

Financially Compelling: The transaction is expected to be immediately accretive to Randstad earnings per share.

90.     Also in the joint press release, van den Broek expanded on the benefits to Randstad,

stating:

> In an era of massive technological change, employers are challenged to identify better ways to source and engage talent. With its industry leading technology platform and easy to use digital, social and mobile solutions, Monster is a natural complement to Randstad. The transaction is aligned with our Tech and Touch growth strategy and reflects our commitment to bringing labor supply and demand closer together to better connect the right people to the right jobs. We look forward to welcoming the Monster team and working together to shape the evolving global job industry.

91.     Unfortunately for Monster's stockholders, despite the tremendous potential of the

Company and the significant benefits to Randstad, the Board members failed to secure a fair deal

for the Company, either for the intrinsic value of its assets or the value of the Company's assets to

Randstad in a combined entity.

## The Board Impermissibly Locked Up the Proposed Transaction

92.     The Merger Agreement contains deal protection devices which substantially

increase the likelihood that the Proposed Transaction will be consummated, leaving Monster's

public stockholders with no meaningful change of control premium for their shares.  When viewed

collectively, these provisions, which are detailed below, further the interests of Randstad, certain

Individual Defendants and other Monster insiders to the detriment of Monster's public

stockholders and cannot represent a justified, appropriate or proportionate response to any threat

posed by a potential third party bidder.

93.     The Individual Defendants have agreed to the following unreasonable deal

protection devices:

- A "no-solicitation" clause that prevents Monster from soliciting, or its directors and officers from even participating in discussions which may lead to a superior proposal from any bidder (Merger Agreement, Section 6.02(a));

- An "information rights" provision that requires the Company to promptly advise Randstad of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal (Merger Agreement, Section 6.02(f));

- A "matching rights" provision that allows Randstad four (4) days to re-negotiate with the Board after it is provided with written notice of the Board's intention to make a change of recommendation, plus an additional two (2) day period following a material amendment to the terms and conditions of a superior offer or the submission of a new offer (Merger Agreement, Section 6.02(f)); and

- A termination fee of $9 million payable by the Company to Randstad if Monster decides to pursue a competing bid (Merger Agreement, Section 9.04).

94. The "no-solicitation" clause, the "information rights" provision, the "matching rights" provision, and the termination fee unfairly restrain the Individual Defendants' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to a third party's written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

95. The reason behind these deal protection devices is clear: the absence of a meaningful premium for stockholders creates the very real potential that a third party bidder will

attempt to usurp Randstad and submit a higher bid for Monster.  The possibility that a third-party bidder will emerge motivated Randstad to "lock-up" the Proposed Transaction by co-opting the Board and forcing them to adopt unreasonable deal protection devices that would ensure that Randstad could purchase the Company for less than would otherwise be possible.

96.     Taken as a whole, the foregoing deal protection devices and the voting agreements essentially foreclose the possibility that a third-party "white knight" could step forward to provide Monster stockholders with a premium for their shares, instead of the opportunistic and inadequate compensation offered by the Proposed Transaction.

**Insiders' Interests in the Proposed Transaction**

97.     Monster insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will receive unique benefits from the Proposed Transaction not available to Plaintiff and the public stockholders of Monster.

98.     While Monster's public stockholders are being cashed out for an inadequate price and foreclosed from participating in the future growth of Monster, in connection with the merger the Company's directors and officers will achieve a substantial payday.  Under section 2.08 of the Merger Agreement, upon consummation of the merger Monster's directors and officers will receive cash payments for each Company restricted stock unit, whether or not vested, and each Company restricted share, in amounts equal to the Offer Price - an opportunity that would not otherwise be available.  The vested and unvested restricted stock units held by the Company's executive officers and non-employee directors, as well as the consideration to be paid to these individuals for their restricted stock units in connection with the Proposed Transaction, are detailed in the following charts:

| Name | Number of Accelerated Company Restricted Stock Units | Value of Accelerated Company Restricted Stock Units | |
|---|---|---|---|
| Timothy T. Yates | 136,262 | $ | 463,291 |
| Mark C. Stoever | 100,000 | $ | 340,000 |
| Michael C. Miller | 43,750 | $ | 148,750 |
| John Gaulding | 69,437 | $ | 236,086 |
| Edmund P. Giambastiani, Jr. | 69,437 | $ | 236,086 |
| James P. McVeigh | 43,103 | $ | 146,550 |
| Gillian Munson | 12,500 | $ | 42,500 |
| Jeffrey F. Rayport | 69,437 | $ | 236,086 |
| Roberto Tunioli | 69,437 | $ | 236,086 |

99.     Additionally, for restricted stock units and performance shares awarded after March 1, 2016, Monster's executive officers and non-employee directors will receive cash payments for each restricted stock units and performance shares, whether or not vested, in amounts equal to the Offer Price.  The following chart details the number of restricted stock units and performance shares awarded after March 1, 2016 held by Company's named executive officers and the value of those shares:

| Name | Number of Converted Post-March 1, 2016 Performance Shares | Value of Converted Post-March 1, 2016 Performance Shares | |
|---|---|---|---|
| Timothy T. Yates | 374,732 | $ | 1,274,089 |
| Mark C. Stoever | 321,199 | $ | 1,092,077 |
| Michael C. Miller | 107,066 | $ | 364,024 |

100.    Further, in the event of employment termination in connection with the Proposed Transaction, Yates stands to receive a lump sum severance payment equal to twice the sum of his base salary and the greater of defendant Yates' target bonus for the year of termination or of the immediately prior year.  Stoever and Monster Executive Vice President, General Counsel and Secretary Michael C. Miller also stand to receive lump sum severance payments in the event of employment termination.

101.    Instead of attempting to negotiate an agreement reflecting the best consideration

reasonably available for the Monster stockholders they are duty-bound to serve, the Individual Defendants disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Transaction to meet their own needs and objectives.  The Board's efforts to advance its members' and officers' personal interests at the expense of the Company's public stockholders have resulted in the inadequate Proposed Transaction being presented to the stockholders at an untenable and inadequate price.

102.     Accordingly, Company insiders stand to receive significant benefits and thus have reason to support the Proposed Transaction, which is otherwise against the best interests of the Company's stockholders.

**The Recommendation Statement Contains Numerous Material Misstatements or Omissions**

103.     Compounding the unfair sale process and the inadequacy of the Offer Price, the defendants also filed the materially incomplete and misleading Recommendation Statement with the SEC and disseminated it to Monster's stockholders.   The Recommendation Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to tender their shares in connection with the Offer.

104.     Specifically, as set forth below, the Recommendation Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Monster's financial projections, relied upon by Monster's financial advisor, Evercore Group L.L.C. ("Evercore"); (ii) the data and inputs underlying the financial valuation analyses that purportedly support the so-called "fairness opinion" provided by Evercore; and (iii) the background process leading to the Proposed Transaction.   Accordingly, Monster stockholders are being asked to make a decision whether to tender their shares in connection with the Offer without all material information at their disposal.

***Material Omissions Concerning Monster's Financial Projections***

105.    The Recommendation Statement fails to disclose material information relating to the Company's financial projections provided by Monster's management and relied upon by Evercore in its analyes.

106.    For example, the Recommendation Statement fails to disclose  the following projection line items, which were utilized in calculating the Company's unlevered free cash flows: (i) operating expenses; (ii) unlevered taxes; (iii) depreciation and amortization; (iv) changes in net working capital; and (v) other nonrecurring adjustments.

107.    The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a)    from page 41 of the Recommendation Statement:

The following is a summary of the Forecasts:

| ($ in millions) | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|
| Revenue | $ 629.1 | $ 643.9 | $ 643.9 | $ 643.9 | $ 643.9 | $ 643.9 |
| Adjusted EBITDA (1) | $ 78.7 | $ 80.6 | $ 80.6 | $ 80.6 | $ 80.6 | $ 80.6 |
| SBC (2) | $ 6.8 | $ 7.6 | $ 7.6 | $ 7.6 | $ 7.6 | $ 7.6 |
| Capex (3) | 33.4 | 33.4 | 33.4 | 33.4 | 33.4 | 33.4 |
| Adjusted EBITDA less SBC (4) | $ 71.9 | $ 73.0 | $ 73.0 | $ 73.0 | $ 73.0 | $ 73.0 |
| Unlevered free cash flow (5) | $ 20.0 | $ 24.6 | $ 21.6 | $ 20.5 | $ 20.5 | $ 20.5 |

(1)    Adjusted EBITDA represents revenue less operating expenses, plus depreciation and amortization expenses, plus non-cash stock-based compensation expenses, plus other non-recurring adjustments.
(2)    Non-cash stock-based compensation.
(3)    Capital expenditures.
(4)    Adjusted EBITDA less SBC means Adjusted EBITDA less stock-based compensation expense and represents revenue less operating expenses, plus depreciation and amortization expenses, plus other non-recurring adjustments.
(5)    Unlevered free cash flow represents revenue less operating expenses, less unlevered taxes, plus depreciation and amortization, less capital expenditures, less change in net working capital.

***Material Omissions Concerning Evercore's Financial Analyses***

108.    The Recommendation Statement describes Evercore's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of

Evercore's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Monster's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Evercore's fairness opinion in determining whether to tender their shares in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Monster's stockholders.

109. For example, with respect to Evercore's *Discounted Cash Flow Analysis* on page 33 of the Recommendation Statement, the Recommendation Statement fails to disclose: (a) the individual inputs and assumptions utilized by Evercore to derive the high discount rate range of 8.5% to 10.5%, including the size premium Evercore used; and (b) the assumptions that Evercore used for the selection of a perpetuity growth rate range of (2.0%) to 2.0%.

110. With respect to Evercore's *Trading Multiples Analysis* on pages 34-36 of the Recommendation Statement, the Recommendation Statement fails to disclose the specific "business or operating characteristics, market valuations or trading valuations" Evercore analyzed in selecting the peer companies used in its analysis.

111. With respect to Evercore's *Precedent Transactions Analysis* on pages 36-37 of the Recommendation Statement, Evercore applied a reference multiple range of 4.5 to 7.5x to the company's total TEV / LTM Adjusted EBITDA to derive the implied valued per share range of $3.29 to $6.00. However, the proxy fails to disclosure the company's LTM adjusted EBITDA figure.

112. The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a)      from page 33 of the Recommendation Statement:

*Discounted Cash Flow Analysis*

Evercore calculated a range of values per Share based on a discounted cash flow analysis to value the Company as a standalone entity. Evercore calculated the net present value of projected unlevered free cash flows for the Company for the last two quarters of fiscal year 2016 and for fiscal years 2017 through 2021 and calculated terminal values based on a perpetuity growth rate ranging from (2.0%) to 2.0% of the Company's terminal year projected unlevered free cash flow. Evercore selected this range of perpetuity growth rates based on the application of its professional judgment. These values were then discounted, using a mid-year convention, to present values as of June 30, 2016 at discount rates ranging from 8.5% to 10.5%, which discount rates were selected based upon an analysis of the weighted average cost of capital of the Company derived using the capital asset pricing model plus a size premium and taking into account the capital structures and costs of equity and debt of the Company and the " **Selected Companies** " identified below in the summary of the Trading Multiples Analysis. This analysis resulted in an implied value per Share ranging from $1.17 to $2.41, compared to the consideration of $3.40 per Share to be received by the holders of Shares in the Offer and the Merger.

Evercore also performed a discounted cash flow analysis using the terminal value multiple method and the range of discount rates summarized above. Evercore calculated the net present value of projected unlevered free cash flows for the Company for the last two quarters of fiscal year 2016 and for fiscal years 2017 through 2021 and calculated terminal values based on a range of multiples of 5.5x to 7.5x of the Company's projected terminal year Adjusted EBITDA less stock-based compensation expense (" **SBC** "). Evercore selected these multiples of terminal Adjusted EBITDA less SBC based on the application of its professional judgment. This analysis resulted in an implied value per Share ranging from $2.68 to $3.96, compared to the consideration of $3.40 per Share to be received by the holders of Shares in the Offer and the Merger.

(b)      from pages 34-36 of the Recommendation Statement:

*Trading Multiples Analysis*

Evercore reviewed and compared certain financial and operating information relating to the Company to corresponding information of eleven selected publicly traded companies in the online job recruitment and human resources solutions and services industries, which are collectively referred to as the Selected Companies. Although none of the Selected Companies is identical or directly comparable to the Company, the companies were chosen because they have one or more business or operating characteristics, market valuations or trading valuations similar to what might be expected of the Company. The Selected Companies were as follows:

| Company | Jurisdiction |
| --- | --- |
| • Axel Springer SE | Germany |

- DHI Group, Inc.            United States of America
- Hays plc            United Kingdom
- ManpowerGroup Inc.            United States of America
- On Assignment, Inc.            United States of America
- PageGroup plc            United Kingdom
- Randstad Holding nv            Netherlands
- Recruit Holdings Co., Ltd.            Japan
- Robert Walters plc            United Kingdom
- SThree plc            United Kingdom
- TEGNA Inc.            United States of America

Evercore calculated and analyzed various financial multiples of the Selected Companies as follows:

- The multiple of total enterprise value, or TEV, calculated as fully diluted equity value plus debt, less unconsolidated assets, less cash and cash equivalents, to estimated EBITDA, which for purposes of the Selected Companies means estimated earnings before interest, taxes, depreciation and amortization, which is referred to below as TEV / EBITDA, for each of calendar years 2016 and 2017, or CY2016E and CY2017E, respectively.

- The multiple of TEV to estimated Adjusted EBITDA, which for purposes of the Selected Companies means estimated earnings before interest, taxes, depreciation and amortization and stock-based compensation expense, which is referred to below as TEV / Adjusted EBITDA, for each of CY2016E and CY2017E, respectively.

- The multiple of TEV to EBITDA less capital expenditures (" Capex "), which for purposes of the Selected Companies means estimated earnings before interest, taxes, depreciation and amortization, less capital expenditures, which is referred to below as TEV/EBITDA less Capex, for each of calendar years 2016 and 2017, or CY2016E and CY2017E, respectively.

The multiples for each of the Selected Companies were calculated using the closing prices of the Selected Companies' common stock on August 3, 2016 and were based on, and derived from, the Selected Companies' publicly available filings and financial data provided by Wall Street research.

This analysis indicated the following for the eleven Selected Companies:

| Metric | High | 75th Percentile | Mean | Median | 25th Percentile | Low |
|---|---|---|---|---|---|---|
| TEV / EBITDA CY2016E | 10.9x | 9.2x | 8.2x | 8.1x | 7.1x | 6.4x |
| TEV / EBITDA CY2017E | 10.2x | 8.9x | 8.0x | 7.8x | 7.5x | 6.0x |
| TEV / Adjusted EBITDA CY2016E* | 8.9x | 8.4x | 7.6x | 7.7x | 6.6x | 5.7x |

| | | | | | |
|---|---|---|---|---|---|
| TEV / Adjusted EBITDA CY2017E* | 9.1x | 8.1x | 7.4x | 7.7x | 6.7x | 5.2x |
| TEV/EBITDA less Capex CY2016E | 14.2x | 10.6x | 9.5x | 9.6x | 7.8x | 6.8x |
| TEV/EBITDA less Capex CY2017E | 12.9x | 9.7x | 9.1x | 9.0x | 8.4x | 6.4x |

> \*        The multiples for the following Selected Companies were not available: Axel Springer SE and Recruit Holdings Co., Ltd.
> This analysis also indicated the following for the three Selected Companies having a market equity value of less than $1 billion (DHI Group, Inc., Robert Walters plc and SThree plc):

| Metric | High | Low |
|---|---|---|
| TEV / EBITDA CY2016E | 8.1x | 6.6x |
| TEV / EBITDA CY2017E | 7.8x | 6.0x |
| TEV / Adjusted EBITDA CY2016E | 8.1x | 5.7x |
| TEV / Adjusted EBITDA CY2017E | 7.8x | 5.2x |
| TEV/EBITDA less Capex CY2016E | 9.7x | 7.8x |
| TEV/EBITDA less Capex CY2017E | 9.2x | 7.1x |

Based upon the information presented in the tables above and the application of Evercore's professional judgment, Evercore selected reference multiple ranges and multiples, which were then applied to:

•        the Company's estimated CY2016E and CY2017E Adjusted EBITDA, which for purposes of the Company means revenue less operating expenses, plus depreciation and amortization expenses, plus non-cash stock-based compensation expense, plus other non-recurring adjustments, which is referred to below as Adjusted EBITDA, for each of CY2016E and CY2017E, respectively;

•        the Company's estimated CY2016E and CY2017E Adjusted EBITDA less stock-based compensation, which is referred to below as Adjusted EBITDA less SBC, which for purposes of the Company means revenue less operating expenses, plus depreciation and amortization expenses, plus other non-recurring adjustments, for each of CY2016E and CY2017E, respectively; and

•        the Company's estimated CY2016E and CY2017E Adjusted EBITDA less capital expenditures and stock-based compensation expense, which is referred to below as Adjusted EBITDA less Capex less SBC, which for purposes of the Company means revenue less operating expenses, plus depreciation and amortization expenses, less capital expenditures, plus other non-recurring adjustments, for each of CY2016E and CY2017E, respectively;

to arrive at the following implied values per Share, compared in each case to the consideration of $3.40 per Share to be received by the holders of Shares in the Offer and the Merger.

| Company Metric | Reference Multiple Range | | Implied Value per Share |
|---|---|---|---|
| CY2016E Adjusted EBITDA | 4.5x – 6.5x | $ | 2.88 – $4.50 |
| CY2017E Adjusted EBITDA | 4.0x – 6.0x | $ | 2.55 – $4.20 |
| CY2016E Adjusted EBITDA less SBC | 5.5x – 7.5x | $ | 3.30 – $4.78 |
| CY2017E Adjusted EBITDA less SBC | 5.0x – 7.0x | $ | 2.99 – $4.49 |
| CY2016E Adjusted EBITDA less Capex less SBC | 7.0x – 9.0x | $ | 2.01 – $2.80 |
| CY2017E Adjusted EBITDA less Capex less SBC | 6.0x – 8.0x | $ | 1.68 – $2.49 |

Although the Selected Companies were used for comparison purposes, none of the Selected Companies is identical or directly comparable to the Company. Accordingly, an analysis of the results of the foregoing necessarily involves complex considerations and judgments concerning differences in financial and operating characteristics of the Company and other factors that could affect the public trading value of the companies to which the Company is being compared. In evaluating the Selected Companies, Evercore made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond the control of the Company, such as the impact of competition on the Company and the industry generally, industry growth and the absence of any adverse material change in the financial conditions and prospects of the Company, the industry or the financial markets in general. Mathematical analysis, such as determining the mean or median, is not in itself a meaningful method of using trading data of the Selected Companies.

(c)     from pages 36-37 of the Recommendation Statement:

*Precedent Transactions Analysis*

Evercore reviewed publicly available information relating to selected acquisition transactions in the online job recruitment and human resources solutions and services industries, which are referred to as the " **Precedent Transactions** ." Evercore chose the Precedent Transactions for purposes of this analysis because Evercore believed they represented relevant transactions in the online job recruitment and human resources solutions and services industries for which information was publicly available and that involved target companies that have one or more business or operating characteristics similar to the Company.

The Precedent Transactions were:

| Month and Year Announced | Acquiror | Target | Target Jurisdiction |
|---|---|---|---|
| November 2014 | Investor group led by Elbrus Capital | Mail.ru Group Limited's HeadHunter business | Russian Federation |
| May 2014 | Axel Springer SE | Daily Mail and General Trust plc's Jobsite business | United Kingdom |

| | | | |
|---|---|---|---|
| March 2014 | The Providence Service Corporation | Ingeus Limited | Australia |
| December 2013 | On Assignment, Inc. | CyberCoders Holdings, Inc. | United States of America |
| October 2013 | Axel Springer SE | YOURCAREERGROUP | Israel |
| March 2012 | Axel Springer SE | RELX PLC's Totaljobs Group business | United Kingdom |
| February 2012 | Lloyds Banking Group plc | Network Group Holdings plc | United Kingdom |
| November 2010 | Chandler Macleod Group Limited | Ross Human Directions Limited | Australia |
| March 2010 | Interlife Holdings Co., Ltd. | D-NA Network Co., Ltd. | Japan |

For each of the Precedent Transactions for which information was publicly available, Evercore calculated the multiples of

• the target company's total enterprise value to last twelve months publicly available earnings before interest, taxes, depreciation and amortization, and, where applicable, certain other non-cash and non-recurring adjustments, referred to below as TEV / LTM Adjusted EBITDA.

This analysis indicated the following:

| Metric | High | 75th Percentile | Median | 25th Percentile | Low |
|---|---|---|---|---|---|
| TEV / LTM Adjusted EBITDA * | 8.5x | 7.6x | 6.6x | 4.5x | 3.7x |

\*      The multiples for the transactions involving the following target companies were not available: Daily Mail and General Trust plc's Jobsite business, YOURCAREERGROUP, RELX PLC's Totaljobs Group business and D-NA Network Co., Ltd.

Based upon the information presented in the tables above and the application of Evercore's professional judgment, Evercore selected reference multiple ranges, which were then applied to the Company's LTM Adjusted EBITDA as of June 30, 2016 to arrive at the following implied values per Share, compared in each case to the consideration of $3.40 per Share to be received by the holders of Shares in the Offer and the Merger. For purposes of this analysis, the Company's LTM Adjusted EBITDA means revenue less operating expenses, plus depreciation and amortization expenses, plus non-cash stock-based compensation expenses, plus other non-recurring adjustments.

| Company Metric | Reference Multiple Range | Implied Value per Share |
|---|---|---|
| TEV / LTM Adjusted EBITDA | 4.5 – 7.5x | $3.29 – $6.00 |

Although the Precedent Transactions were used for comparison purposes, none of those transactions is identical or directly comparable to the Offer or the Merger, and none of the target companies in the Precedent Transactions is identical or directly comparable to the Company. In evaluating the Precedent Transactions, Evercore made judgments and assumptions with regard to general business,

economic, market and financial conditions and other matters, many of which are beyond the control of the Company, such as the impact of competition on the business of the Company and the industry generally, industry growth and the absence of any adverse material change in the financial conditions and prospects of the Company, the industry or in the financial markets in general. Mathematical analysis, such as determining the mean or median, is not in itself a meaningful method of using transaction data of the Precedent Transactions.

113.    Without such undisclosed information, Monster stockholders cannot evaluate for themselves whether the financial analyses performed by Evercore were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which Evercore's opinion and analyses should factor into their decision whether to tender their shares in support of the Proposed Transaction.

***Material Omissions Concerning the Flawed Sale Process***

114.    The Recommendation Statement also fails to disclose or misstates material information relating to the sale process leading up to the Proposed Transaction, including:

(a)    The Board's rationale for not breaking exclusivity with Randstad once Randstad significantly reduced its offer from $4.00 to $3.40 per share on August 4, 2016, and instead agreeing to move forward with Randstad at the inadequate $3.40 per share Offer Price;

(b)    Why the Board allowed Yates and Stoever to spearhead negotiations with potential counterparties when they stood to benefit as a result of a potential merger and whether the Board considered establishing a special committee of disinterested directors to oversee the sale process;

(c)     Yates' basis for determining that "in order for him to recommend a transaction with Strategic Acquirer E to [the] Board, it would have to be at a price of at least $5.00 per Share and have no financing condition."

(d)     Why the Board failed to initiate a formal due diligence process with Financial Acquirer B following its $4.45 per share indication of interest on or around April 1, 2016 and again following Financial Acquirer B's July 13, 2016 letter reaffirming its interest in acquiring Monster on the terms previously provided;

(e)     The Board's rationale for agreeing to an exclusivity period with Randstad at a price of $4.00 per share despite Strategic Acquirer E's July 21, 2016 representation that "preliminary indications from their financing sources could probably yield a $4.15 to $4.20 price per Share for Monster" - $0.15 to $0.20 above Randstad's indication of interest; and

(f)     Whether the standstill provisions contained in the confidentiality agreements executed by Monster and potential transaction counterparties fell away upon execution of the Merger Agreement.

115.     The omission of this information renders the following statements in the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act:

(a)     from pages 14-15 of the Recommendation Statement:

In May 2014, in response to the accelerating transformation of the online recruitment industry, Monster announced a new strategic plan to enhance the scale of its job, resume and profile content (the "All the Jobs, All the People" strategy) requiring both technological innovation in connecting employers and potential employees and a transition to a solutions and performance based sales approach. The net effect of this transition, combined with increased pressure from competitors, including competition causing revenue and pricing pressure, led to declines in Company revenues and financial results in the remainder of 2014 and 2015, which resulted in a substantial reduction in the price of Monster's common stock. Monster's commitment to maintain EBITDA margin at a time when newer

competitors were increasing their investment added to the challenge of investing in the transformation called for by its strategy.

While management and the Board remained committed to continuing to execute the "All the Jobs, All the People" strategy, Tim Yates, our Chief Executive Officer, spoke frequently with members of our Board about the significant challenges facing Monster and alternatives to maximize stockholder value. From these conversations a consensus emerged among the members of our Board that engaging in a formal sale process had significant risks that could be detrimental to stockholder value, including: as experienced in 2013, the possible negative publicity associated with a process that does not result in a sale transaction, the increased risk of leaks, and the potential impact on customers, employees, and the business that could arise from these risks. Instead, since many of Monster's likely acquirers were customers or other entities that as a matter of course maintained contact with Monster, consensus emerged among members of the Board that Mr. Yates and management should have the opportunity to field indications of interest without having to engage in a sale process and update the members of our Board. Accordingly, throughout the process described below, Mr. Yates maintained close contact with the members of our Board, updating them and taking guidance from them.

* * *

During the course of a regular scheduled meeting of our Board on February 9, 2016, the Board discussed the challenges facing Monster and Mr. Yates provided the Board with an update on the discussions with Strategic Acquirer A.

(b)     from page 16 of the Recommendation Statement:

On April 7, 2016, Financial Acquirer C executed a confidentiality agreement with the Company. The confidentiality agreement included a standstill that prohibited Financial Acquirer C from making any proposal regarding a possible acquisition of Monster, other than a confidential proposal to our Board to acquire Monster. Promptly following execution of the confidentiality agreement, Monster shared select financial information with Financial Acquirer C, including preliminary first quarter results for 2016.

(c)     from page 17 of the Recommendation Statement:

On April 24, 2016, after a number of attempts by representatives of Evercore to contact representatives of Financial Acquirer B during the preceding weeks, representatives of Financial Acquirer B informed representatives of Evercore that Financial Acquirer B would not be able to increase its indicative price above $4.45 without additional information from Monster. Because Monster had not yet decided to initiate a formal due diligence process with Financial Acquirer B, and due to the impending first quarter 2016 earnings announcement, Monster paused conversations with Financial Acquirer B. Monster believed at the time that Financial Acquirer B would be able to participate in a formal sale process, if one

were initiated.

* * *

On May 12 and 13, 2016, Messrs. Yates and Stoever met with Linda Galipeau, the Chief Executive Officer of Randstad North America and other representatives of Randstad to broadly discuss the topics from the March 26 th discussion and the development of a more meaningful relationship between the two companies. During this discussion, Mr. Yates told Ms. Galipeau that if a broader strategic alliance would include a business combination, in order for him to recommend such a transaction to the Board, the offer would have to be at an "above-market" premium.

Over the next month, Ms. Galipeau called Mr. Yates several times to communicate that Randstad was impressed with Monster's technology and personnel and that Randstad would be conducting a financial review to determine if it could accommodate an "above-market" premium. To better assist Randstad in its analysis, Ms. Galipeau proposed a meeting on June 9, 2016 involving Randstad and Monster management so that Randstad could gain a deeper understanding of Monster's technology, products, and strategy.

During the course of a regular scheduled meeting of our Board on June 6 and 7, 2016, Mr. Yates updated the Board on our quarterly results, the ongoing challenges facing Monster, and the current status of indications of interest in Monster.

At an industry event on June 9, 2016, Mr. Stoever and other representatives of Monster met with Jacques van den Broek, Chief Executive Officer of Randstad Holding, Ms. Galipeau, and members of the Randstad Innovation Fund, Randstad's strategic corporate venture fund in San Jose, CA. Mr. Stoever and other representatives of Monster gave a presentation regarding Monster and our technology, products and strategy to Mr. Van den Broek, Ms. Galipeau and members of the Randstad Innovation Fund.

On June 15, 2016, Ms. Galipeau called Mr. Yates to reiterate Randstad's interest in pursuing a transaction with Monster, and to inform Mr. Yates that Randstad would seek to work towards an agreeable price, but needed to conduct preliminary due diligence on several items prior to proposing a price. Ms. Galipeau indicated a desire for exclusivity with Monster. Mr. Yates reiterated the need for both an "above-market" premium and an expedited timeframe, and with that understanding, agreed to provide the requested due diligence materials, subject to the execution of a confidentiality agreement.

(d)      from page 18 of the Recommendation Statement:

Later on June 20, 2016, Randstad executed the Confidentiality Agreement with Monster. The Confidentiality Agreement included a standstill provision that prohibited Randstad from making any proposal regarding a possible acquisition of

Monster, other than a confidential proposal to our Board to acquire Monster.

\* \* \*

Also on July 5, 2016, at the request of a potential commercial partner (Strategic Acquirer E), Mr. Yates met with representatives of Strategic Acquirer E to discuss a possible commercial relationship. During the course of the meeting, representatives of Strategic Acquirer E indicated that they would like Mr. Yates to meet their chairman, who had indicated a desire to acquire Monster. Mr. Yates noted that Monster was not for sale, but would always consider what was in the best interests of its stockholders, and that in order for Mr. Yates to recommend a proposal to our Board, the transaction would need to be at an "above-market" premium. No price was discussed.

\* \* \*

On July 7, 2016, Strategic Acquirer E signed a confidentiality agreement with Monster. The confidentiality agreement included a standstill that prohibited Strategic Acquirer E from making any proposal regarding a possible acquisition of Monster, other than a confidential proposal to our Board to acquire Monster.

(e)     from pages 19-20 of the Recommendation Statement:

Following receipt of Randstad's indication of interest, Mr. Yates called Ms. Galipeau later that same day and told her that the proposed price of $3.70 per Share was not sufficient to grant exclusivity. He also told her that a new potential strategic acquirer was moving on an expedited time frame. Finally, he advised her that Monster wished to have a definitive agreement negotiated and announced no later than the announcement of second quarter earnings. With respect to the change in control provisions in agreements with certain members of management, Mr. Yates and Ms. Galipeau agreed that there would be no condition to closing with respect thereto and, in connection with the finalization of the Merger Agreement, would ultimately agree that prior to the closing, the Company would use commercially reasonable efforts to modify the change in control arrangements to provide that executives would not exercise their right to resign for good reason for at least 60 days following the closing of the transaction.

\* \* \*

On the morning of July 21, 2016, a representative of Strategic Acquirer E called Mr. Yates and reported that preliminary indications from their financing sources could probably yield a $4.15 to $4.20 price per Share for Monster but, given that they do not have certainty from their financing sources and that they would need to review with their board, they were not able to provide any firm or written indication of interest or offer at this time.

(f)     from page 23 of the Recommendation Statement:

On August 4, Ms. Galipeau called Mr. Yates to tell him that, based on Randstad's due diligence and its review and analysis of Monster's financial forecasts for the third and fourth quarters of 2016, as provided on August 1, 2016, Randstad and its financial advisor did not believe that Monster would achieve the profitability that they had previously assumed in determining their valuation and therefore Randstad was no longer willing to proceed at the $4.00 per Share offer price. Instead, Ms. Galipeau stated that Randstad was only willing to proceed at an offer price of $3.40 per Share. Following review and discussion with each member of our Board, Mr. Yates told Ms. Galipeau that Monster would proceed at this offer price on the following conditions: (i) the parties continue to proceed on the timeframe for executing definitive documentation and announcing a transaction on or before August 9, 2016; (ii) confirmation that Randstad's due diligence was substantially complete and (iii) the material terms of the Merger Agreement were in place.

(g)     from page 25 of the Recommendation Statement:

On August 23, 2016, Financial Acquirer F signed an Acceptable Confidentiality Agreement with Monster. The confidentiality agreement included a standstill that prohibited Financial Acquirer F from making any proposal regarding a possible acquisition of Monster other than a proposal to our Board on a confidential basis. In accordance with the Merger Agreement, Randstad was provided a copy of the confidentiality agreement. Following the execution of the confidentiality agreement, Monster provided Financial Acquirer F access to its electronic data room and Financial Acquirer F began its due diligence of Monster.

116.    Defendants' failure to provide Monster stockholders with the foregoing material information renders the statements in the "Background of the Merger; Reasons for the Recommendation" section of the Recommendation Statement false and/or materially misleading and constitutes a violation of  Sections 14(e) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder.   The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy.   Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

**Class Claims Against All Defendants for Violations
of Section 14(d) of the Exchange Act and SEC Rule 14d-9**

117.    Plaintiff repeats all previous allegations as if set forth in full.

118.    Defendants have caused the Recommendation Statement to be issued with the intention of soliciting Monster stockholders to tender their shares in the Offer.

119.    Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

120.    The Recommendation Statement violates Section14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omission render the Recommendation Statement false and/or misleading.

121.    Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

122.    The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, who will be deprived of their right to make an informed decision whether to tender their shares if such misrepresentations and omissions are not corrected prior to the expiration of the Offer.  Plaintiff and Class have no adequate remedy at law.  Only through the

exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## COUNT II

### Class Claims Against All Defendants for Violations of Section 14(e) of the Exchange Act

123.    Plaintiff repeats all previous allegations as if set forth in full.

124.    Defendants violated Section 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices, in connection with the tender offer commenced in conjunction with the Proposed Transaction.

125.    Defendants knew that Plaintiff would rely upon their statements in the Recommendation Statement in determining whether to tender his shares pursuant to the tender offer commenced in conjunction with the Proposed Transaction.

126.    As a direct and proximate result of these defendants' unlawful course of conduct in violation of Section 14(e) of the Exchange Act, absent injunctive relief from the Court, Plaintiff has sustained and will continue to sustain irreparable injury by being denied the opportunity to make an informed decision in deciding whether or not to tender his shares.

## COUNT III

### Class Claims Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

127.    Plaintiff repeats all previous allegations as if set forth in full.

128.    The Individual Defendants acted as controlling persons of Monster within the meaning of section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as

officers or directors of Monster and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

129.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

130.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

131.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

132.    By virtue of the foregoing, the Individual Defendants have violated section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Monster, and against defendants, as follows:

A.      Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: September 9, 2016

/s/ Mitchell J. Matorin

Mitchell J. Matorin (BBO# 649304)
MATORIN LAW OFFICE, LLC
18 Grove Street, Suite 5
Wellesley, Massachusetts 02482
(781) 453-0100
mmatorin@matorinlaw.com

**WEISSLAW LLP**
Richard A. Acocelli

Michael A. Rogovin
Kelly C. Keenan
Seth M. Rosenstein
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system to be sent electronically to the registered participants on September 9, 2016.

/s/ Mitchell J. Matorin
Mitchell J. Matorin